MARGARITO ROMERO, Treasurer, etc., Plaintiff in Error, v. BOARD OF EDUCATION OF THE CITY OF LAS VEGAS, OF THE TERRITORY OF NEW MEXICO, Defendant in Error.

### SYLLABUS BY THE COURT.

1. SCHOOL LAWS—REPEAL OF ACT OF 1891.—Section 35 of chapter 25 of the Session Laws of 1891, providing that certain temporary funds for school purposes should be paid into the county treasury to the account of the several school districts wherein such sums are collected, was, in effect, repealed by chapter 59, Laws of 1893. (Section 1548, C. L. of 1897.)

2. SCHOOL REVENUE FROM GAMING LICENSES—APPORTIONMENT OF.— After the repeal of section 35 of chapter 25 of the Session Laws of 1891, revenue derived from gaming licenses for school purposes was distributable, as provided by section 13 of the act of 1891, (section 1526 C. L. of 1897) by apportionment to the several districts within the county in proportion to the number of children residing in each over five and under twenty-one years of age, that being the only law providing for its distribution.

*Error* to the District Court of San Miguel County, Fourth Judicial District. Reversed and remanded with directions.

Facts are stated in the opinion.

CHARLES A. SPIESS for plaintiff in error.

1. The sole question for review in this cause is this: Does the revenue derived from gaming licenses belong to the school fund of the district wherein it is collected, or to the general school fund which is distributed among the several school districts of the county?

The answer to this question lies entirely within the statutory enactments relating to our common school system, and the funds established thereby for the maintenance of the system.

On February 12, 1891, an act was passed entitled "An act establishing common schools in the Territory of New Mexico, and creating the office of Superintendent of Public Instruction." This act, together with the subsequent act amendatory thereto, passed by the same Legislature on February 26, 1891, was manifestly intended to cover the entire subject matter of the establishment and maintenance of public schools, and supplanted all antecedent legislation upon that subject.

For the maintenance of the system initiated by the above legislation, various school funds were created, and provision was made for their distribution among the different school districts of the several counties.

One of the funds thus created is a general tax levy, not to exceed three mills on the dollar, upon the taxable property of the Territory, to be paid by the collectors of taxes to the treasurers of the counties to the credit of the county school funds. It was also provided that the school superintendent of the county should apportion this fund, together with all the county school funds, on the first Mondays of January, April, July and October of each year among the several districts within the county, in proportion to the number of children residing in each district over the age of five and under the age of twenty-one years.

There were also other funds created which were by the

act denominated "temporary" funds for common school purposes.

The acts of 1891, as amended and substituted by subsequent legislation, have been compiled as sections 1514 to 1611, inclusive, of the Compiled Laws of 1897, and those sections relating to the disposition of the fund derived from gaming licenses are as follows:

"Sec. 1526. That he shall also (referring to the county school superintendent) on the first Mondays in January, April, July and October of each year, or as soon thereafter as he has received the certificate of the Territorial Board of Education signifying the amount appropriated to his county for the use of common schools for the current year, apportion such amount, together with all the county school fund for the same purpose, to the several districts within the county in proportion to the number of children residing in each over five and under twenty-one years of age.  *  *  *  *  *  *  *

"Sec. 1558. That the school fund derived from the general levy of three mills on the dollar of taxable property shall be paid directly by the several collectors to the treasurers of their respective counties to the credit of the county school funds, and shall be apportioned as now provided by law, together with all the county school funds, by the county superintendent of schools on the first Mondays of January, April, July and October.

"Sec. 1305. That there shall be assessed and collected in the manner prescribed by law as in case of other licenses, a tax of two hundred dollars for the period of twelve months, to be paid in advance, on each gaming table.  *  *  *  *  *  Provided, that the license herein provided shall only be receivable in current funds of the United States, and upon the payment of said license fee by said applicant, it shall be paid into the hands of the county treasurer to be covered into the school funds of the county.  *  *  *  *

"Sec. 1548. That the following are hereby declared to be and are to be temporary funds for common school pur-

poses, and shall be paid to the county treasurer, to be applied by the county treasurer to the general school fund of each respective county.

"First—The proceeds of all sales of intestate estates which escheat to the Territory.

"Second—All forfeitures or recoveries on bonds of county, precinct or Territorial school officers.

"Third—The proceeds of all fines collected for violation of the penal laws.

"Fourth—The proceeds of the sales of lost goods or estrays.

"Fifth—All moneys arising from licenses imposed upon wholesale and retail liquor dealers, distilleries, breweries, wine presses, which now pay license, or may hereafter be required to pay license.

"Thirty-three and one-third per cent. of all the moneys arising from the above enumerated sources, when collected, shall be paid into the county treasury to the account of the general county school fund of each county in which collected."

These are all of the provisions of the law which have any bearing upon the question involved in the case at bar. It will be observed that section 1305, which provides for the licensing of games of chance, in positive terms requires that upon payment of the license it shall be paid into the hands of the county treasurer to be covered into the school funds of the county. Reading this section in conjunction with section 1558, which requires the school fund derived from the general levy of three mills to be paid directly to the treasurer. to the credit of the county school funds and to be apportioned as now provided by law, together with all the county school fund, leaves no doubt as to the disposition to be made of the gaming licenses.

Sec. 1305 in terms provides that revenue derived from gaming licenses shall be covered into the school funds of the county. Section 1558 in terms provides that the revenue derived from the three mill levy together with all the

county school fund shall be apportioned as now provided by law. Recurring to section 1526 we find the manner of apportionment provided and referred to in section 1558, wherein the county superintendent is required on the first Mondays of January, April, July and October of each year to apportion the revenue derived from the general three mill levy, together with all the county school fund, to the several districts within the county in proportion to the number of children residing in each, over five and under twenty-one years of age.

The argument upon the effect of these statutes expressed in a syllogism is this:

The law requires the superintendent to apportion all the county school funds among the several school districts of his county.

The gaming license fee is one of the county school funds.

Therefore the law requires the superintendent to apportion the gaming license fee among the several school districts of his county.

The mediate inference that funds derived from gaming licenses are to be apportioned among all the districts of the county, and are not to be credited to the district wherein collected is irresistible.

No language could have been employed in framing these several acts which could have more clearly defined the legislative intent that gaming licenses should be apportioned among the districts of the county. And this intent, couched in plain and unambiguous language, can not be modified by construction.

"It is not allowable in a constitution any more than in a statute to interpret that which has no need of interpretation." Beardstown v. Virginia, 76 Ill. 34.

"Nor can the inconvenience or hardship that may ensue the enforcement of a provision, the terms of which are unmistakable, justify its modification by construction." U. S. v. Fisher, 2 Cranch 358.

"It is only where a statute is capable of two or more meanings that interpretation or any latitude of construction is allowable." Nundt v. Sheboygan, etc., R. R. Co., 31 Wis. 451.

In Bates Refrigerating Co. v. Sulzberger, 157 U. S. 1-36, the Supreme Court of the United States said: "In our judgment the language used is so plain and unambiguous that a refusal to recognize its natural obvious meaning would be justly regarded as indicating a purpose to change the law by judicial action based upon some supposed policy of Congress. But as declared in Hadden v. Collector, 5 Wall, 107-111, 'what is termed the policy of the government with reference to any particular legislation is generally a very uncertain thing.' * * * * It is a ground much too unstable upon which to rest the judgment of the court in the interpretation of statutes. Where the language of the act is explicit, this court has said, 'There is great danger in departing from the words used to give an effect to the law which may be supposed to have been designed by the Legislature. It is not for the court to say, where the language of the statute is clear, that it shall be so construed to embrace cases, because no good reason can be assigned why they were excluded from its provisions.' "

On this subject Cooley, in his work on Constitutional Limitations, at page 69, says: "In case of all written laws it is the intent of the lawgiver that is to be enforced. But this intent is to be found in the instrument itself. Where a law is plain and unambiguous, whether it be expressed in general or limited terms, the Legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction. Possible or even probable meanings when one is plainly declared in the instrument itself, the court is not at liberty to seach for elsewhere." See also Bosley v. Mattingly, 14 B. Mon. 89; Sturgis v. Crownshield, 4 Wheat. 122; Ingalls v. Cole, 47 Me. 530; Newell v. People, 7 N. Y. 9; Bidwell v. Whittaker, 1 Mich. 469; Johnson v. Hudson R. R. Co., 49 N. Y. 455; St. Louis R. R. Co. v. Clark, 53 Mo. 214.

Ita Lex Scripta Est disposes of this entire matter.

2.   Although construction is obviously unnecessary and improper in the solution of the question of the case at bar, still the interpretation of the statutory enactments upon which its solution depends, consonant with the rules and canons of construction sanctioned and employed by courts of justice, leads us to the same conclusion.

The act of 1891 provides for temporary school funds as follows:

1.   The proceeds of all intestate estates which escheat to the Territory.   *   *   *   *   *

5.   All moneys arising from licenses imposed upon wholesale and retail liquor dealers, distilleries, breweries, wine presses, gambling tables or games of chance which may now pay licenses or may hereafter be required to pay licenses.

All the moneys arising from the above enumerated sources when collected shall be paid into the county treasury to the account of the several school districts wherein such sums are collected.

The execution of this law gave rise to an irrepressible conflict between the inhabitants of the towns and municipalities on the one hand and those of the rural districts on the other, which finally culminated in the case of Board of Education of East Las Vegas v. Jesus M. Tafoya, Treasurer of San Miguel County, 6 N. M. Rep. 292.   In this case the Supreme Court, in an able and exhaustive opinion by His Honor, Judge John R. McFie, very properly held that under section 35 of chapter 25 of the Laws of 1891 revenue derived from liquor licenses belonged to the district wherein it was collected.   Section 35 of chapter 25 of the Laws of 1891 was by the Legislature of 1893 amended by chapter 59 of those acts, which amendatory act was afterward compiled as section 1548 of the Compiled Laws of 1897.

The Legislature of 1893 in chapter 59 of its acts provided "That section 35 of chapter 25 of the Session Acts of 1891 be amended so as to read as follows," and then enacted what is now section 1548 of the Compiled Laws of 1897,

making no reference whatever to moneys arising from gambling tables or games of chance, and in that act made no provision for the disposition of moneys arising therefrom.

Prior to the passage of chapter 59, supra, the same Legislature passed an act, chapter 30 of the Laws of 1893, which required gambling tables and games of chance to pay a license fee of $200 per annum each. At the time of the enacting of chapter 30, supra, section 35 of chapter 25 of the Laws of 1891 was still in force, and under its provisions moneys derived from gambling licenses and games of chance were to be paid into the county treasury to the account of the school district wherein it was collected.

Now, with the law in force as it was when the gaming license fund was created by the act of 1893, section 35 of chapter 25 of the Laws of 1891 was amended by chapter 59 of the Laws of 1893 "so as to read as follows," and the disposition of the gaming license fund provided by section 35 of the original act was entirely omitted. It thus becomes important to arrive at the effect of the amendment of section 35 of chapter 25 of the Laws of 1891 by chapter 59 of the Laws of 1893.

Sutherland, in his work on Statutory Construction, at section 137, lays down the following rule of construction:

"Laws are presumed to be passed with deliberation and a knowledge of all existing laws on the same subject. If they profess to make a change by substituting new for old provisions, a repeal to some extent is thus suggested, and the extent readily ascertained. Thus, amendment is frequently made by enacting that a certain section shall be so amended as 'to read as follows,' then inserting the substituted provisions without specification of the change. The parts of the former law left out are repealed. This intention is manifest. There is a negative necessarily implied that such eliminated portion shall no longer be in force." Citing: Moore v. Mausert, 49 N. Y. 332; People v. Supervisors, 67 N. Y. 109; McRoberts v. Washburn, 10 Minn. 23;

State v. Andrews, 20 Tex. 230; Gossler v. Goodrich, 3 Cliff, 71; State v. Ingersoll, 17 Wis. 631; Goodno v. Oshkosh, 31 Wis. 127; Breitung v. Lindauer, 37 Mich. 217; Longlois v. Longlois, 48 Ind. 60; Mosby v. Insurance Co., 31 Gratt. 629; State v. Wish, 15 Neb. 448. See also, People ex rel. v. Board, 84 N. Y. 610.

In view of the overwhelming authority sanctioning this rule of construction, its binding force can not be questioned.

"The parts of the former law left out are repealed." Consequently the provision of section 35 of chapter 25 of the Laws of 1891, requiring moneys derived from gaming licenses to be paid into the county treasury to the account of the school district wherein they were collected, being left out of the amendatory act of 1893, is repealed.

If the very provision of section 35 of chapter 25 of the Laws of 1891, which furnished the only law giving the school district wherein the gaming license fee was collected the money derived from its collection, and such money was paid to such district only by virtue of this provision, and that provision is repealed, how can it be contended that the school district wherein the gaming license is collected is still entitled to it, and in the face of a subsisting statute which in terms provides that such money shall be paid into the school fund of the county and then distributed among the several school districts of the county?

If the Legislature had intended that moneys derived from gaming licenses should belong to the districts wherein collected it would not have manifested such intention by repealing the very and sole law that provided for such disposition.

It is an admitted rule in the interpretation of statutes that clauses that have been repealed may still be considered in construing the provisions that remain in force. Ex parte Crow Dog, 109 U. S. 556-561; Banks for Savings v. Collector, 3 Wall. 495-513.

And in considering the displaced legislation we must conclude that there was a change of intention on the part

of the Legislature of 1893 as to the manner of disposition of moneys derived from gaming licenses, or else why was not the law permitted to stand as it was enacted by the Legislature of 1891?

As was pertinently said by the Supreme Court of Colorado in Hennison v. State, 23 Pac. 995-997, "It is nevertheless the duty of the judicial department to discover the intention of the law-making power in making changes, so far as such intention may be disclosed by the application to the provision of well settled rules of statutory construction, and when discovered to so construe the act as to effectuate the purpose of the framers thereof.

"In obedience to one such rule of construction we are required to presume that the change of language made by the amendment indicates a change of intention on the part of the Legislature, and consequently calls for a change of construction."

Frank Springer, Andrieus A. Jones, William C. Reid for defendant in error.

1. The sole question for review in this cause, is one of statutory construction, are the words the "School funds of the county" intended to declare the purpose for which the gaming license is to be used, or do these words go further and also provide for the distribution of the said fund?

In a decision of this court, in an opinion by His Honor, John R. McFie, construing the intent of similar words, we find the following language:

"The Legislature determines that this fund shall be devoted to school purposes, and while the language is, that it is covered into the general school fund of the county, it still remains apparent that this language is used in a general sense, and substantially says, that the license fund shall be devoted to school purposes. This section is one of accumulation and not of distribution." Board of Education v. Tafoya, 6 N. M. p. 294.

In 1887, a law was passed providing for the payment

of gaming licenses of $100 per annum on each game, and also providing that the money thus collected should go to the school fund of the county.

On February 12, 1891, the Legislature passed a law providing for a general school system. In regard to the apportionment of the school fund it provided in section 13 of that law (Ch. 25) which is now section 1526 of the Compiled Laws, that he shall also (referring to the county superintendent) on the first Mondays in July and January of each year, or so soon thereafter as he has received the certificate of the Territorial Board of Education, signifying the amount apportioned to his county for the use of the common schools of the current year, apportion such amount, together with all the county school fund, for the same purpose, to the several districts of the county, in proportion to the number of children residing in each, etc.

In the above quoted section the words are used which the defendant contends imply that license money is considered a part of the school funds of the county, but this Legislature evidently did not place such a construction on them, for in another section of the same chapter of this law we find that a specific distribution has been made of the various license moneys in section 35, which is as follows:

That the following are hereby declared to be and remain temporary funds for common school purposes:

First—The proceeds of all sales of intestates' estates which escheat to the Territory.

Second—All forfeitures or recoveries on bonds of county, precinct or Territorial school officers.

Third—The proceeds of all fines collected for the violations of the penal laws.

Fourth—The proceeds of the sales of lost goods or estrays.

Fifth—All moneys arising from licenses imposed upon wholesale and retail liquor dealers, distilleries, breweries, wine presses, gambling tables or games of chance, which now pay license or may hereafter pay license.

All moneys arising from the above enumerated sources, when collected, shall be paid into the county treasury, to the account of the several school districts wherein such sums are collected, etc.

There, of course, can be no question, that the last above quoted law and the gaming license law first herein referred to, would place this sum so collected on gaming licenses to the account of the school districts wherein it is collected.

The next law that appears on the statute books of the Territory is chapter 30 of the Laws of 1893, approved February 17 of that year. This chapter is compiled as section 1305, C. L. '97. This is simply an amendment of the law of 1887 above referred to, in that it makes the price of a license $200 instead of $100. The Legislature in this statute employs the words in designating the purpose to which the money thus collected shall go as follows: "Upon payment of the said license fee by said applicant it shall be paid into the hands of the county treasurer to be covered into the school funds of the county." The defendant admits that these words taken with the statute which was then in force, to wit: Chapter 25, section 35, L. '91, intend that the money thus collected shall go to the school district wherein it is collected. See brief of plaintiff in error, page 9. Here, then, is the second instance in which the Legislature employed the words, "Paid into the school fund of the county." When it was clear it intended that after it was so placed it should be distributed to the school districts wherein it was collected.

The question will very naturally arise, "Why were such words employed by the Legislature?" There is a very good reason for this. The bulk of the school fund was to be raised by a three mill levy; this money was not paid to the school fund of the county, but the treasurer of the county turned it over to the Territorial Treasurer, and the Territorial Board of Education apportioned it to the different counties of the Territory in proportion to the number of school children residing therein, so it was possible that one county would pay $1,000 into the school fund and get back for

distribution but $500 (see chapter 25 L. 1891, sections 4 and 24.)   It was a very wise thing for the Legislature to say that this money should be covered into the school fund of the county, instead of making no provision of this sort and allowing the money thus collected to be distributed all over the Territory.

Now there can be no question as to the intention of the Legislature, that at the time of passing the present gaming license act (section 1305 C. L. '97), that the money derived therefrom should go to the school district wherein the same was collected, and since it is a fundamental rule in the construction of statutes that the intention of the statute is the law, this intention will live as long as the statute lives. The rule is that a statute is perpetual until repealed by a subsequent act or by a subsequent act inconsistent with it. U. S. v. Gear, 3 Howard, p. 120.

Was the intention which the Legislature had at the time of the enacting section 1305 C. L. '97, changed by the enactment of chapter 59 of the Laws of 1893?   That law being in terms as follows:

Section 1.   That section 35 of chapter 25 of the Session Laws of 1891 be amended to read as follows:

That the following are hereby declared to be and are to be temporary funds for common school purposes, and shall be paid to the county treasurer to be applied by the county treasurer to the general school fund of each respective county:

First—The proceeds of the sales of intestate estates which escheat to the Territory.

Second—All forfeitures or recoveries on bonds of county, precinct or Territorial officers.

Third—The proceeds of all fines collected for the violation of the penal laws.

Fourth—The proceeds of the sales of lost goods or estrays.

Fifth—All moneys arising from licenses imposed upon wholesale and retail liquor dealers, distilleries, breweries,

wine presses, which now pay license or may hereafter be required to pay license.

Thirty-three and one-third per cent. of all the moneys arising from the above enumerated sources, when collected, shall be paid to the county treasurer to the account of the general school fund of each county in which collected. The collector or person paying the above enumerated moneys to the county treasurer shall receive from the county treasurer a receipt in full for the amount paid in.

Section 2. The county treasurer shall notify the county superintendent of the public schools in their respective counties on the last day of every month of all funds collected for school purposes in that month.

Section 3. This act shall be in full force and take effect on and after January 1, 1895.

This statute last above quoted, and set out, makes no mention of the distribution of the gaming license revenue, but the law has the effect of repealing all of section 35 of chapter 25 of the Laws of 1891, and it was this section which we used to show the legislative intent in framing the present gaming law pointing out the distribution of the money collected after it had reached the school fund of the county. And for that purpose we may still refer to it though repealed.

The rule that statutes in pari materia are to be consulted for the construction of each other, holds good, though some of the statutes may have expired, or even been repealed. Sedgwick on the Construction of Statutory and Constitutional Law, p. 212; Sutherland on the Construction of Statutes, p. 372; I. Burrows, p. 445; Mass. p. 21; 109 U. S. p. 561; 120 U. S. p. 726.

The repeal of section 35 of chapter 25 of the Laws of 1891 does not affect the intention which the Legislature had when the present gaming license law was passed, and that intention must live as long as the statute itself lived, unless expressly repealed or a subsequent statute enacted the terms of which are repugnant to it. Is there anything

in the subsequent law to wit:   Chapter 59 L. 93 (section 1548, C. L. 97) repugnant to placing the money derived from gaming licenses to the account of the school district from which it was collected?   Nothing whatever.   In fact the law last mentioned impliedly admits that all the license money collected, not therein specifically apportioned should go to the school districts, from which it is collected, by the following language:   Thirty-three and one-third per cent. of all the moneys arising from the above enumerated sources, when collected, shall be paid into the county treasury to the account of the general school fund of each county in which collected.   Where, we will ask the defendant, does he place the other two-thirds collected, and if there is not an intention and authority running through all the statutes of this Territory to place all license money to the credit of the school districts wherein they are collected, where then does the defendant get his authority for placing a dollar of any license money to the credit of a particular district instead of the general county school fund?

The only two statutes we have in New Mexico now in force that deals with the distribution of the license money are section 1305 of C. L. and section 1548 C. L.   These statutes were passed at the same session of the Legislature, the first mentioned being approved on the seventeenth day of February, and the second on the twenty-third day of February.   Reading these two statutes together, as we are permitted to do, in the construction of such statutes where would the gaming license be placed?   Undoubtedly it would go where the two-thirds of the other licenses go and for which no special provision is made for the distribution.

Section 1558 C. L. 1897 is cited by the defendant as showing how the distribution of the gaming license might be made.   That section reads as follows:.

That the school fund derived from the general levy of three mills on the dollar of taxable property, shall be paid directly by the several collectors to the treasurers of the respective counties to the credit of the county school fund,

and shall be proportioned as now provided by law, together with all the county school fund, by the county superintendent of schools on the first Mondays in January, April, July and October.

This section of the law was in force when this court by an opinion rendered by His Honor, John R. McFie, decided that the license money collected should be distributed to the school districts wherein it was collected. Board of Education of East Las Vegas v. Tafoya, 6 N. M. p. 292, so that section of the Compiled Laws is entirely out of the question so far as the distribution of license money is concerned.

As a further evidence that this section did not intend to deal with money derived from licenses, we will call attention to the fact that it was enacted fourteen days after Chapter 25 L. 91, in which was provided a distribution of this fund to the school districts from which collected, and was an amendment to that very statute. Now, in amending that statute, if the Legislature had intended that the words school funds of the county to provide for a distribution of the license money, would it not have expressly repealed section 35 of chapter 25?

In every instance in which the Legislature of this Territory has dealt with gaming licenses and all other licenses, both in existing and repealed statutes, it is plain that it has always intended and provided that license money should go to the districts from which collected. There is only one exception to this, and that is in chapter 59 L. '93, where the Legislature, presumably through a compromise, takes one-third of the money derived from liquor licenses, etc., and turns it over to the general fund to be distributed as the three mill levy money is distributed. It says nothing about the distribution of gaming license money or the other two-thirds of the money from other licenses, manifestly intending that it should continue as it had been to the school districts from which collected, and we take it as admitted that if there is no law providing expressly that license money shall go elsewhere, that it will go to the school districts wherein it is collected.

, Section 1548, C. L. 1897, did not go into effect for nearly two years after its passage and during this period of two years the defendant admits that the money accumulated under section 1305 of C. L. 1897, should go to the districts wherein it was collected, yet at the end of this two years he takes the position that section 1305 should begin to operate differently, though this section is not referred to or is there anything repugnant to it, in the later law section, section 1548.

2. Section 1558, C. L. 1897, is direct authority for the payment of gaming licenses to the districts from which collected.

Chapter XXVIII of the Session Laws of 1887, provided for a gaming license, and fixed the amount at one hundred dollars per annum, payable quarterly, in advance. This act provided that the money collected should be paid into the school fund of the county from which the license was obtained. This act made no provision for distribution. In 1891, the Legislature, by section 35, chapter XXV of its Session Laws, provided that this fund should be distributed to the districts from which the licenses should be collected.

The gaming law of 1887 was amended by chapter 30 of the Laws of 1893 so as to fix the license at two hundred dollars per annum, payable in advance, but no other substantial change was made.

Section 1, of chapter LXXVII, Laws of 1891, and which is now section 1558 of the Compiled Laws of 1897, provided that the funds derived from the three mill levy, together with all the county school funds, should be apportioned "as now provided by law." At that time the gaming license was a part of the county school fund; that is, it was used for school fund purposes in the county. Under section 35, chapter XXV of the Laws of 1891, this was distributed to the districts from which it was collected.

Section 1, of chapter LXXVII, Laws of 1891, simply provided in general terms that all of the county school funds should be distributed as then provided by law. This section 1, of chapter LXXVII, has never been repealed, and

requires all county school funds to be apportioned in the manner provided by law on the twenty-sixth of February, 1891. The manner then provided was that licenses for gaming should be turned over to the school districts from which the fund was derived. This section is still in force, and is direct authority for the paying of this fund to the district from which it is collected. Instead, therefore, of this section sustaining the contention of the plaintiff in error, it directly sustains the contention of the defendant in error.

CRUMPACKER, J.—On the twenty-first day of August, A. D. 1899, the board of education of the city of Las Vegas of the Territory of New Mexico, defendant in error herein, filed a petition for a writ of mandamus in the district court of San Miguel county, seeking thereby to compel Margarito Romero, treasurer of the county of San Miguel, and plaintiff in error herein, to place to the credit of the school district of the city of Las Vegas, of the Territory of New Mexico, certain moneys collected by him for gaming licenses from persons carrying on gaming in the school district of the city of Las Vegas. An alternative writ of mandamus was awarded in the cause, directing Margarito Romero, the plaintiff in error herein, to credit the moneys described in the petition for the writ of mandamus to the account of the district of the city of Las Vegas, and to pay the money over to the treasurer of the board of education of the city of Las Vegas when demanded. For answer and return to the alternative writ and the petition in said cause, the plaintiff in error demurred, among other things, upon the ground that under the laws of the Territory of New Mexico money collected upon account of gaming licenses is the property of the general school fund of the county wherein it is collected, and does not belong to the school district wherein it is collected.

Upon a hearing in the cause the demurrer filed therein was overruled, and a peremptory writ of mandamus was awarded in accordance with the prayer of the petition. The plaintiff in error, Margarito Romero, sued out a writ of

error in this court to the district court of San Miguel county, and assigned the following as error in the record and proceedings in said cause, to wit:

1. The district court erred in not holding that the petition and alternative writ of mandamus issued in said cause and neither of them stated no cause of action. 2. The district court erred in not holding that the petition and the matters and things therein stated were not sufficient in law to entitle the defendant in error to the relief prayed for in said petition. 3. The district court erred in not holding that it was not the duty of said Margarito Romero, treasurer, etc., to cover the moneys mentioned and described in said petition and alternative writ into the school funds of said county of San Miguel to be credited to said district of East Las Vegas. 4. The said district court erred in awarding a peremptory writ commanding said Margarito Romero, etc., to cover the moneys mentioned and described in the petition and alternative writ into the school fund of San Miguel county, to be credited to the school fund of East Las Vegas.

The pleadings present the inquiry: What is the legislative will in regard to the distribution of revenue derived from gaming licenses. The answer must be found in the statutory enactments relating to our common school system, or relating to the funds established for its maintenance, and in whatever judicial construction may heretofore have been given those acts.

On February 12, 1891, an act was passed entitled "An act establishing common schools in the Territory of New Mexico and creating the office of Superintendent of Public Instruction." This act, together with the subsequent act, amendatory thereof, passed by the same Legislature on February 26, 1891, was manifestly intended to cover the entire subject matter of the establishment and maintenance of public schools, and supplanted all antecedent legislation on that subject. Thereby, various school funds were created and provision was made for their distribution. Gaming

School laws: repeal of act of 1891.

licenses were designated by section 35 of the act of February
12, 1891, as an item of one of the temporary funds, which
funds were by said section made payable into the county
treasury to the account of the several school districts
wherein such sums are collected. Revenues available for
school purposes, other than those designated as temporary
funds, were distributable under section 13 of that act to the
several districts within the county, in proportion to the
number of children of school age residing in each. This
court held in Board of Education of East Las Vegas v.
Tafoya, Treasurer, 6 N. M. 292, that under section 35 of
chapter 25 of the Laws of 1891, revenue derived from liquor
licenses (which licenses were designated together with
gaming and other licenses in the same subdivision fifth
of said section 35, as parts of the temporary funds) be-
longed to the district wherein it was collected. In reaching
this conclusion this court there inquired into the intention of
the Legislature in enacting chapter 9 of the Laws of 1891.
Appellant in that case contended that section 3 of said
chapter 9 provided that the revenue derivable from liquor
licenses belonged to the general county school fund, and
should be apportioned and distributed to all of the school
districts in the county. But this court, speaking by Justice
McFee, in this connection, say: "It will be observed that
chapter 9 is entitled 'An act licensing the sale of intoxicat-
ing liquors and regulating the same.' The entire chapter
is devoted to the subject of license, having no reference by
title to school purposes. It provides a graduated system of
license, ranging in amounts from $100 to $400, and erects
the legal machinery necessary to carry the system into suc-
cessful operation. The legislative mind was, therefore, at
the time of the passage of what is known as the 'high license
law,' absorbed in the perfection of the law licensing and
regulating the sale of intoxicating liquors aside from all
other subjects. Section 3 is the only section of the entire
act that refers to schools or school funds, and that section
is couched in very general terms. In adopting the license

system, a large fund would necessarily be derived from it, which fund must be devoted to some proper purpose, and must have a custodian. The Legislature determines that this fund shall be devoted to school purposes and, while, the language used is that it is to be covered into the general school fund of the county, it still remains apparent that this language is used in a general sense and substantially says that the license fund shall be devoted to school purposes. But a single section is used for this purpose, and that section is one of accumulation and not of distribution: Under this section the license fund is placed in the hands of the county treasurer of the respective counties, without any provisions whatever for its disbursement, and from this fact, and the further fact of which we take judicial knowledge, that a few days later the same Legislature passed an act for the disbursement of school funds, we have a right to presume that the Legislature had in mind the subsequent act of distribution, and therefore remitted the whole subject of the distribution of the license and other school funds to the further act of the Legislature."

Were there no legislation, subsequent to the general school law of 1891, affecting the distribution of revenue derived from licenses imposed upon the gaming tables or games of chance, we should be compelled to conclude as to such licenses, as this court concluded in the case cited in construing the liquor license act, that by virtue of section 35 of that act and of section 27 of the Session Laws of 1887, entitled "An act repealing certain sections of the gaming law and providing a substitue therefor," together with chapter 30 of the Laws of 1893, amending chapter 27 of said Laws of 1887, increasing the license and making minor regulations concerning gaming, such licenses belonged to the school district in which they were collected. The language designating the general use to be made of revenue derived under the liquor license act, which was construed in the case of Board of Education v. Tafoya, supra, is "upon the payment of said license fee into the hands of the county

treasurer to be covered into the general school fund of the county," and the language designating the use to be made of revenue derived from the gaming license law of 1887, and its amendment of February 17, 1893, here under consideration, is, in the former, "the license when collected shall be paid into the school fund of the county," and, in the latter, "said license fee shall be paid into the hands of the county treasurer to be covered into the school funds of the county." This identical language used in a similar connection having been heretofore judicially construed to have a certain meaning, we must presume that the Legislature by the use of the same language in like connection subsequent to such judicial construction intended it should have no different meaning.

Therefore, the question arises: Has there been any subsequent legislation affecting the distribution of licenses imposed upon gaming? This court has decided in Board of Education v. Tafoya, supra, that chapter 25 of the Laws of 1891, itself provided for the distribution of all available funds for the support of the school system, and that the revenue derivable from liquor licenses was particularly distributable under section 35 of said act; analogously, revenue derived from gaming licenses was at that time distributable in like manner. However, on February 23, 1893, it was enacted (section 1305, C. L. of 1897) "that section 35 of chapter 25 of the Session Laws of 1891, be amended to read as follows:" This enactment has the effect of repealing all of section 35 of chapter 25 of the Laws of 1891, and makes no mention whatever of revenue derived from, or of the distribution of revenue derived from gaming licenses. The Legislature in effect thereby declared to be repealed the provision of law under which all money arising from gaming tables or games of chance was payable into the county treasury to the account of the several school districts wherein such sums were collected. We conclude in considering this displaced legislation that the

*SCHOOL revenue from gaming license: apportionment of-*

Legislature merely intended to change the mode of distribution of revenue derived from gaming licenses, from a particular to a general one.  Section 13 of the General School Law of 1891 (section 1526, C. L. of 1897) provides for "Apportionment of the revenue derived from a Territorial tax levy for school purposes, together with all the county school fund for the same purpose to the several districts within the county in proportion to the number of children residing in each, over five and under twenty-one years of age."  Having found that the fund accumulated by virtue of the gaming license law was to be devoted to school purposes, and no particular mode for its distribution being by law now provided, we think it very clear that the fund so accumulated is subject to the general distribution by apportionment, as provided by section 13 of the act of 1891, together with all the other county school funds not otherwise particularly distributed.

It has been urged upon the court that the school districts in which these licenses are collected, and where gambling is carried on under legislative sanction, should receive all possible benefit from the revenue derived from such source in order to counteract, so far as possible, the evil of having gaming carried on within their limits; but these are matters which can be urged with propriety only upon the legislative department of the government.

We conclude that the district court erred in not sustaining the demurrer to the petition.  The judgment is therefore reversed and the cause remanded with directions to the court below to sustain the demurrer and to dismiss the petition.

Parker and McFie, JJ., concur.